Slip Op. 09-59

## UNITED STATES COURT OF INTERNATIONAL TRADE

TARGET CORPORATION,

                    Plaintiff,

          v.                                    Before: Leo M. Gordon, Judge

UNITED STATES,                                  Consol. Court No. 06-00383

                    Defendant.

## OPINION

[Plaintiffs' motions for judgment on the agency record denied; judgment for Defendant.]

Dated:  June 17, 2009

Jochum Shore & Trossevin PC (Marguerite E. Trossevin) for Plaintiff Target Corporation.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Max F. Schutzman, Bruce M. Mitchell, William F. Marshall, Andrew T. Schutz) for Plaintiffs Qingdao Kingking Applied Chemistry Co., Ltd., Dalian Talent Gift Co., Ltd., Shanghai Autumn Light Enterprise Co., Ltd., Zhongshan Zhongnam Candle Manufacturer Co., Ltd., Nantucket Distributing Co., Inc., Shonfeld's (USA), Inc., Amstar Business Company Limited, and Jiaxing Moonlight Candle Art Co., Ltd.

Barnes Richardson & Colburn (Jeffrey S. Neeley) for Plaintiff Specialty Merchandise Corporation.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael J. Dierberg, David S. Silverbrand); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (Arthur D. Sidney, Brian R. Soiset, Irene H. Chen), of counsel, for Defendant United States.

Barnes & Thornburg LLP (Randolph J. Stayin, Karen A. McGee) for Defendant-Intervenor National Candle Association.

Gordon, Judge:   Before the court are the Final Results Pursuant to Court Remand (Nov. 10, 2008) ("Remand Determination") filed by the U.S. Department of Commerce ("Commerce") pursuant to Target Corp. v. United States, 32 CIT ___, 578 F. Supp. 2d 1369 (2008) ("Target"), a consolidated action in which Plaintiffs, Target Corporation ("Target"), Qingdao Kingking Applied Chemistry Co., Ltd., et al. ("Qingdao"), and Specialty Merchandise Corporation ("SMC"), have challenged Commerce's final affirmative circumvention determination that petroleum wax candles with 50 percent or more palm or other vegetable-oil based waxes ("mixed-wax") are later-developed merchandise covered by the antidumping duty order on petroleum wax candles from China.  See Petroleum Wax Candles from the People's Republic of China, 71 Fed. Reg. 59,075 (Dep't Commerce Oct. 6, 2006) (final determination anticircumvention inquiry) ("Final Determination"); Issues and Decision Memorandum for the Later-Developed Merchandise Anticircumvention Inquiry of the Antidumping Duty Order on Petroleum Wax Candles from the People's Republic of China (A-570-504), at 23 (Sept. 29, 2006) (J. App. 11, PR 187), available at http://ia.ita.doc.gov/frn/summary/prc/E6-16613-1.pdf (last visited June 17, 2009) ("Decision Memorandum"); Memorandum from Julia Hancock, Case Analyst, Evidence Memorandum for the Later-Developed Merchandise Anticircumvention Inquiry of the Antidumping Duty Order on Petroleum Wax Candles from the People's Republic of China (Sept. 29, 2006) (J. App. 36, PR 189) ("Evidence Memorandum").  The court has jurisdiction pursuant to Section 516a(a)(2)(B)(vi) of the Tariff Act of 1930, as amended,

19 U.S.C. §1516a(a)(2)(B)(vi) (2006)[1] and 28 U.S.C. § 1581(c) (2000).  For the reasons

set forth below, the court sustains the Remand Determination.

## II. Standard of Review

When reviewing an anticircumvention determination under 19 U.S.C.
§ 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), the Court of International Trade sustains
Commerce's determinations, findings, or conclusions unless they are "unsupported by
substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.
§ 1516a(b)(1)(B)(i).  When reviewing whether Commerce's actions are unsupported by
substantial evidence, the court assesses whether the agency action is reasonable given
the record as a whole.  See Nippon Steel Corp. v. United States, 458 F.3d 1345,
1350-51 (Fed. Cir. 2006).

## III. Discussion

Although the court presumes familiarity with its Target decision, some
background will aid the reader.  In the Final Determination Commerce determined that
mixed-wax candles are later-developed merchandise covered by the antidumping duty
order on petroleum wax candles from China.  The central statutory question for
Commerce during the proceeding was whether mixed-wax candles, which were
arguably in existence at the time of the antidumping investigation, could nonetheless
still constitute "later-developed merchandise" within the meaning of the statute.
Section 1677j(d)(1) defines "later-developed merchandise" as "merchandise developed
after an [antidumping] investigation is initiated." 19 U.S.C. § 1677j(d)(1) (emphasis

---

[1] Further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of
the U.S. Code, 2006 edition.

added). The question for Commerce was whether mixed-wax candles were "developed" by the time of the initiation of the investigation or "developed" sometime thereafter.

In interpreting section 1677j(d)(1), Commerce identified "two key elements" to define "later-developed" merchandise: (1) there had to be a significant technological advancement or a significant alteration of the subject merchandise involving commercially significant changes—an advancement/alteration factor, and (2) the merchandise had to be commercially unavailable at the time of the less than fair value investigation—a commercial availability factor.  Final Determination, 71 Fed. Reg. at 59,077.

In Target, among other things, the court reviewed the advancement/alteration factor and determined that Commerce's proposed requirement that later-developed merchandise must in every instance entail a "significant alteration" or "significant technological advance" of the subject merchandise was contrary to the statute.  Target, 32 CIT at ___, 578 F. Supp. 2d at 1377-78.  Upon remand Commerce reconsidered its interpretation of the meaning of the term "later-developed" and agreed with the court that later-developed merchandise does not necessarily entail a significant alteration or technological advance in every instance.  Remand Determination at 2.  Consequently, Commerce abandoned this as a requirement for merchandise to be "later-developed."

In Target the court sustained Commerce's commercial availability factor as a reasonable interpretation of the statute entitled to deference.  Target, 32 CIT at ___, 578 F. Supp. 2d at 1375-76.  On the substantial evidence question of whether mixed-wax candles were commercially unavailable at the time of the initiation of the

investigation, the court held that Commerce's purported finding (in which it could not "definitively conclude" that mixed-wax candles were commercially available at the time of the antidumping investigation), created confusion for purposes of judicial review. The court explained:

> Rather than make a straightforward finding that mixed-wax candles were commercially unavailable at the time of the LTFV, Commerce introduced an unexplained, subjective, evidentiary standard—definitive conclusiveness—and found this standard had not been met. It is a puzzling turn of phrase; it almost bespeaks an administrative presumption of commercial unavailability-rebuttable by definitively conclusive evidence (whatever that may be) of commercial availability. Commerce, though, directly contradicted such notions:
>
>> [B]oth Respondents and Petitioners had the burden to establish whether mixed-wax candles were commercially available at the time of the LTFV investigation. All parties were given the opportunity to submit evidence that mixed-wax candles were available or evidence that mixed-wax candles were not available in the market. Accordingly, the burden did not rest on any single party.
>
> [Decision Memorandum at 25]. The net effect of all this is that the court cannot review Commerce's new, subjective, evidentiary standard and the associated "finding" in its present posture, and therefore must remand to Commerce for further consideration.

Target, 32 CIT at __, 578 F. Supp. 2d at 1376. To resolve the confusion, the court directed Commerce to either (a) make a straightforward finding of commercial unavailability or (b) explain how the proposed "definitive conclusiveness" evidentiary standard constitutes a reasonable interpretation of the anticircumvention provision. Id.

In the Remand Determination Commerce made a straightforward finding that mixed-wax candles were commercially unavailable at the time of the original investigation, and further clarified that a gradual evolution of wax-mixing technology

allowed the appearance in the market of mixed-wax candles after the antidumping investigation. Remand Determination at 3-4, 7-12.

Plaintiffs challenge aspects of the Remand Determination, as well as aspects of the Final Determination, including whether Commerce's commercial unavailability finding was reasonable (raised by Qingdao), whether Commerce's findings in applying the Diversified Products[2] criteria were reasonable (raised by Qingdao), and finally whether Commerce's inclusion of mixed-wax candles within the scope of the Order as of the date of the notice of initiation of the anticircumvention inquiry constituted an impermissible retroactive application of the law (raised by Qingdao and Target). As for the Remand Determination Plaintiffs challenge Commerce's finding of commercial unavailability, arguing that Commerce improperly applied a presumption of commercial unavailability; and that in any event, Commerce's finding is not supported by substantial evidence. Plaintiffs also challenge Commerce's finding of a "gradual evolution" of technology as unclear, unsupported by substantial evidence, and contrary to previous findings by Commerce.

## A. Commercial Unavailability Finding

Plaintiffs argue that Commerce's finding of commercial unavailability in the Remand Determination is an entirely new finding not supported by record evidence, and further that Commerce improperly applied a presumption of commercial unavailability.

---

[2] The factors set forth in 19 U.S.C. § 1677j(d)(1) to determine whether "later-developed merchandise" is within the scope of an outstanding antidumping duty order are derived from the court's decision in Diversified Prods. Corp. v. United States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983). They are commonly referred to as the Diversified Products criteria.

<u>See</u> Target Comments on Remand Determination 3-8 ("Target Comments"); Qingdao Comments on Remand Determination 1-9 ("Qingdao Comments").    Commerce, however, explained in the <u>Remand Determination</u> that it was not making an entirely new finding of commercial unavailability.    Commerce instead stated that it was merely clarifying its "intent [in the <u>Final Determination</u>] to clearly state that there was no information on the record that mixed-wax candles were commercially available prior to the LTFV investigation."    <u>See Remand Determination</u> at 4.    On remand Commerce did not – nor was it required to – address again each and every piece of evidence in the record, or explain again why it found some evidence less persuasive than others on the question of commercial availability.    Commerce had already done that in the <u>Final Determination</u>, and the accompanying <u>Decision Memorandum</u> and <u>Evidence Memorandum</u>.

Target argues that Commerce unreasonably employed a rebuttable presumption of commercial unavailability.    Target Comments 8.    In support of its argument, Target claims that Commerce never asked the petitioner, the National Candle Association ("NCA"), to provide "definitive proof" that mixed-wax candles were commercially unavailable prior to the investigation.    Target Comments 8.    The problem for Target is that Commerce did not ask any of the parties to provide "definitive proof" of commercial unavailability.    The fact is that all of the parties, including the NCA, were asked to provide evidence of the presence of mixed-waxed candles in the marketplace.

Specifically, in a January 18, 2006 letter, Commerce asked all interested parties to submit evidence of the commercial availability of mixed-wax candles in the

U.S. market.   The NCA submitted hundreds of pages of brochures, price lists, and marketing materials dating back to 1986.   <u>See</u> Petitioner NCA's Response to Questionnaire (Feb. 15, 2006) ("NCA Feb. 15, 2006 Submission"), Exs. C1-C43. (J. App. 17, PR 116); <u>see also</u> <u>Decision Memorandum</u> at 25 (J. App. 11, PR 187).   None of the companies identified in these marketing materials offered mixed-wax candles at the time of the antidumping investigation (1985-86).   <u>Id.</u>

Again, in a June 2, 2006 questionnaire, Commerce asked all interested parties to provide marketing materials, <u>i.e.</u>, product catalogs, brochures, product initiations, articles, etc. that identify when mixed-wax candles were available for sale in the market. The NCA submitted a comprehensive survey of more than 2,200 product catalogues from 1985 to 2004 that demonstrate the fact that mixed-wax candles were not available in 1985-1986.   <u>See</u> Petitioner NCA's Response to Questionnaire (June 23, 2006), Exs. 3, 4, 6-10. (J. App. 15, PR 160); <u>see also</u> <u>Decision Memorandum</u> at 25 (J. App. 11, PR 187).   It was not until the early 2000s that brochures and marketing materials first began expansively promoting mixed-wax candles as a new development. <u>Id.</u>

In addition to the brochures, price lists, marketing materials, and advertisements, the NCA also provided affidavits of long-standing industry members, stating that at the time of the original LTFV investigation in 1985-1986, mixed-wax candles were not in the marketplace, and that they were not commercially available.   <u>See</u> NCA Feb. 15, 2006 Submission, Exs. B1-B5 (J. App. 17, PR 116).   Additionally, the NCA provided testimony before the United States International Trade Commission ("ITC")

that mixed-wax candles were not in the marketplace and not commercially available at the time of the antidumping investigation.  Id. Ex. D (J. App. 17, PR 116).  The NCA also submitted independent marketing studies showing that mixed-wax candles did not appear in the market until the early 2000s.   See Decision Memorandum at 25 (J. App. 11, PR 187); see also NCA Jan. 14, 2005 Submission, Ex. C (J. App. 18, PR 014).

       In response to Commerce's specific requests, the NCA submitted evidence that mixed-wax candles were commercially unavailable at the time of the antidumping investigation.  In contrast, Plaintiffs claimed that some of this very same evidence was just not available and that they were not required to keep records that far back.  Target Comments 10; see Decision Memorandum at 25-26 (J. App. 11, PR. 187). Thus, Commerce solicited and received evidence on commercial availability rather than imposing a presumption of commercial unavailability as Plaintiffs claim.  Commerce appears to have simply misspoken about the commercial availability requirement in the Final Determination -- an error that Commerce has corrected in the Remand Determination.

       With the clarification of a straightforward finding of commercial unavailability from Commerce in the Remand Determination, the court now addresses Qingdao's original arguments contesting the reasonableness of this finding. Qingdao references five documents from the administrative record that purportedly demonstrate that mixed-wax candles were sold in the market prior to the petroleum wax candle investigation.

Qingdao Mot. J. Agency Rec. 38-43 ("Qingdao Br."). First, Qingdao quotes the petroleum wax candle original injury determination in which the ITC stated:

> There are two broad categories of wax used for commercial purposes: natural and synthetic. The bulk of candle manufacturing utilizes natural waxes, principally paraffins, microcrystallines, stearic acid and beeswax. However, specialty candle making operations do have requirements for the more 'exotic' types of wax, such as hydrogenated vegetable oil or jojoba.

Candles from the People's Republic of China, USITC Pub. 1888, Inv. No. 731-TA-282, at 51-52 (Aug. 1986) (final injury determination) ("Original Injury Determination"). Qingdao argues that this statement "clearly implies that the more 'exotic' mixed-wax candles were commercially available in the market." Qingdao Br. 38.

Second, Qingdao references a 1906 manual on soap and candle making (entitled the "Lamborn Manual") that discusses the benefits of mixing stearic acid with paraffin wax. Qingdao Br. 41-42. Qingdao claims stearic acid is a derivative of vegetable fats or waxes. Qingdao Br. 41-42. Third, Qingdao highlights a 1921 product catalogue from the Will & Baumer Candle Company containing two products called "composite candles." Qingdao Br. 42. Qingdao claims "composite candles can mean nothing less than a candle mixed with, at the very least, paraffin and stearic acid." Qingdao Br. 42. Fourth, Qingdao cites a 1934 patent issued to Howard Will of the Will & Baumer Candle Company ("Will Patent") for a mixed-wax candle containing 50 percent or more vegetable wax. Qingdao Br. 43-44. Finally, Qingdao cites an article from the Financial Times, dated August 24, 1983, that discusses the increase in the price of palm oil and its use in the manufacture of candles. Qingdao Br. 42-43.

Commerce considered this evidence in its <u>Final Determination</u>.  With respect to

the <u>Original Injury Determination</u>, Commerce concluded:

> [W]hile Respondents argue that mixed-wax candles were referenced by the ITC, [Commerce] finds that mixed-wax candles, as subject to this inquiry, were not discussed as being in commercial production.  In any case, the ITC clarified its statements in the <u>ITC Second Sunset Review</u>, stating that
>
>> the evidence on the record of this review indicates that there was no commercial production in the Unites States (or elsewhere) of blended candles in 1986, when the [ITC] made its original determination.  The [ITC] therefore did not consider in the original investigation whether to include blended candles containing 50 percent or less petroleum wax in the domestic like product.
>
> Therefore, the clarification issued by the ITC as part of its second sunset review analysis is further affirmative evidence that mixed-wax candles were not available in the United States market or the PRC market at the time of the LTFV investigation.

<u>Decision Memorandum</u> at 23-24 (quoting <u>Candles from the People's Republic of China</u>,

USITC Pub. 3790, Inv. No. 731-TA-282 (July 2005) (second sunset review)

(J.  App. 14, PR 104) ("<u>Second Sunset Review</u>")).

With respect to the <u>Lamborn Manual</u>, the Will & Baumer product catalogue, the

Will Patent, and the article from the <u>Financial Times</u>, Commerce concluded:

> Several parties have argued that, because patents were issued describing mixes of petroleum wax with other waxes (or stearic acid), [Commerce] should conclude that mixed-wax candles were available in the market. [Commerce] disagrees.  [Commerce] notes that, although a patent may be issued, the end-product listed as resulting from the invention, as specified within that patent, may never appear in the market.  Specifically, only Petitioners have submitted evidence linking the patents issued after the LTFV investigation with the commercial appearance of mixed-wax candles, . . . . In contrast, Respondents cite to the numerous patents, the Lamborn Manual and a Financial Times article discussing vegetable oil (not wax) mixed with paraffin.  Neither of these are indicative of the

technology now at issue, much less commercial availability of those mixed-wax candles in the market before the LTFV investigation.

* * *

Respondents also submitted the <u>Lamborn Manual</u> and the Will & Baumer product catalogue from 1921 as evidence that mixed-wax candles were available prior to the LTFV investigation. However, [Commerce] notes that neither the <u>Lamborn Manual</u> nor the Will & Baumer product catalogue reference mixed-wax candles. Instead they either refer to candles containing stearic acid, which is not a vegetable-based wax, or they refer to composite candles but without indicating what these composite candles contain.

<u>Decision Memorandum</u> at 24-25.

As noted from the excerpts above, Commerce did not ignore Plaintiffs' evidence. Rather, Commerce weighed the evidence and arguments and ultimately found that mixed-wax candles were not available in the market at the time of the LTFV investigation. The NCA submitted a survey of product catalogues dating from 1985 to 2004. This survey reviewed over 2,227 product catalogues and found that "the first instance of a blended candle containing palm wax advertised for sale was in 1998." <u>Id.</u> at 25. The NCA also submitted industry reports dating from 1995 to 2002 that do not list mixed-wax candles appearing until 2002. <u>Id.</u> Finally, the NCA submitted sales data from its member companies. Commerce concluded that this sales data demonstrated "that the earliest any party sold any mixed-wax candle was in 1999." <u>Id.</u> at 26.

In the <u>Remand Determination</u> Commerce again explained that the record evidence showed that mixed-wax candles did not appear in the market until 1999, and that the record shows a dramatic increase in patents concerning mixed–wax candles in the 1990s that would indicate mixed-wax candles were not being commercially

produced until this time.  <u>Remand Determination</u> at 4.  Commerce further explained that its finding of commercial unavailability was consistent with the conclusion of the ITC in the <u>Second Sunset Review</u>, that "there was no commercial production in the United States (or elsewhere) of blended candles in 1986, when the commission made its original determination."  <u>Id.</u>

Plaintiffs challenge Commerce's explanation of the patent evidence in the <u>Remand Determination</u>, as well as its finding that mixed-wax candles were not commercially available until 1999.  Target Comments 4; Qingdao Comments 6.  Target, in particular, argues that Commerce's description of the increase in patents filed in the 1990s and thereafter related to mixed-wax candles ignores "31 patents issued before the investigation that relate to the production of mixed-wax candles."  Target Comments 5.

Commerce, though, reasonably found these arguments unpersuasive.  For Commerce, the pre-investigation patents would have been more probative if they were supported by additional evidence of the commercial appearance of mixed-wax candles in the marketplace at the time of the LTFV investigation.  Of the 30 or so patents identified by Target, most are not addressed to candle wax.  Some of the patents concern novel wicks and wick systems that may be used with any conventional candle. NCA Rebuttal Br. 28-29 (J. App. 16, PR 178).  Others involve novel decorative features, most of which are simply applied to an existing conventional candle, or incorporated into a conventional wax, and yet others relate to candle body production techniques or preparation methods using conventional waxes.  NCA Rebuttal Br. 28-29 (J. App. 16,

PR 178).   Target singles out four of the pre-investigation patents, including the Will patent, which it claims are relevant to mixed-wax compositions.   Target Comments 5. Commerce observed that although a patent may be issued, the resulting end product that is the subject of the patent may never appear in the market. Decision Memorandum at 24 (J. App. 11, PR 187).

Commerce considered all of the pre-investigation patents cited by Target (including the Will patent) and determined that there was no evidence linking these patents with the commercial appearance of mixed-wax candles in the marketplace. See id.; see also Evidence Memorandum at 2-9 (J. App. 36, PR 189).   Thus, Commerce's conclusion in the Final Determination that these pre-investigation patents were of little or no probative value on the question of commercial availability is reasonable given the record evidence.

Target argues that the pre-investigation patent activity is equally indicative of the commercial production of mixed-wax candles as are the post-investigative patents. Target Comments 7.   This argument though is not persuasive.   The record contains nearly 40 patents issued after the LTFV investigation directed to novel wax compositions, specifically including vegetable waxes and mixed-waxes, and novel techniques and processes for making modern candles regardless of wax composition. More important, the record includes direct evidence linking these patents with the appearance of mixed-wax candles in the marketplace in the late 1990s.   Decision Memorandum at 24 (J. App. 11, PR 187); see Evidence Memorandum at 2-9 (J. App. 36, PR 189).   This evidence consists of press releases issued by the largest

wax producer, Cargill, publicizing its acquisition of the rights to the technology enabling the production of mixed-wax candles from wax compositions developed by Dr. Bernard Tao and set forth in two patents filed after the LTFV investigation (the Tao patents[3]); a multi-million dollar lawsuit filed on October 10, 2003, by Candle Corporation of America ("CCA"), a major respondent in the underlying circumvention proceeding, over the rights to the new technology in the Tao patents, see Second Sunset Review at 34-36 (CCA admits that it "conceived" of the idea in 1993 to develop candles made of a mixture of vegetable wax and petroleum wax and approached Dr. Tao to develop the technology to create such a candle); and affidavits by U.S. candle producers describing the production of mixed-wax candles and referencing specific patents filed after the investigation.    See Decision Memorandum at 24 (J. App. 11, PR 187); Second Sunset Review at 34-36.   The post-investigation patents are relevant to the technological issues and suggest lack of commercial production of mixed-wax candles. There is also evidence on the record linking the production of mixed-wax candles to certain of the patents filed after the original antidumping investigation.

     In the Remand Determination Commerce found significant the appearance in the 1990s and thereafter of patents directed to mixed-wax composition.  The majority of the post-investigation, mixed-wax candles patents  were filed in the late 1990s or thereafter and  began  issuing  in  the  2000s.    See Later-Developed Merchandise Petition

---

[3] The two Tao patents were initially filed by Dr. Tao in 1998 and were referred to throughout the underlying proceeding as the Tao patents.  Target finds noteworthy that the two Tao patents did not issue until 2001, two years after Commerce found mixed-wax candles became commercially available. Target Comments 6.  In actuality, the Tao patent applications were filed in 1998, which is consistent with Commerce's finding that mixed-wax candles did not appear in the market until 1999.

(Oct. 8, 2004) Ex. 3.  (J. App. 13, PR 001).  It was the timing of these new patents and their link to the appearance of mixed-wax candles in the marketplace that Commerce found persuasive.  The record supports Commerce's finding that there was a dramatic increase in the number of patents directed to mixed-wax compositions in the 1990s and thereafter.

Plaintiffs also challenge Commerce's finding that the record evidence showed that mixed-wax candles did not appear in the market until 1999.  Target Comments 3. The record contains direct evidence supporting Commerce's finding.  Both U.S. and foreign candle producers submitted sales data and affidavits stating that they did not start producing and selling mixed-wax candles until at least as early as 1999. See Decision Memorandum at 26 (J. App. 11, PR 187); CCCFNA Quantity and Value Submission (Feb. 16, 2006) Exs. 1-7 (J. App. 19, PR 114).  This direct evidence is consistent with the timing of the post-investigative patents directed to mixed-wax candles in the 1990s and thereafter; the timing of the independent market studies, and brochures introducing entirely "new" mixed-wax candles in the early 2000s; the timing of the first scope requests directed at mixed-wax candles in 2001; and the ITC findings in the Second Sunset Review.  Commerce's finding that mixed-wax candles did not appear in the market until 1999 is therefore reasonable.

Target, nonetheless, argues that evidence on the record, namely, the pre-investigation patents and the ITC's original injury determination, contradict this finding.  Target Comments 3.  As explained above, Commerce did not find the pre-investigation patents a persuasive indicator of commercial availability at the time of the

antidumping investigation.   Likewise, in the <u>Final Determination</u>, Commerce did not consider Plaintiffs' arguments about the <u>Original Injury Determination</u> persuasive in view of the ITC's subsequent clarification in the <u>Second Sunset Review</u> that there was "no commercial production in the United States (or elsewhere) of blended candles in 1986, when the commission made its original determination there."   <u>See</u> <u>Decision</u> <u>Memorandum</u> at 24 (J. App. 11, PR 187).

In the <u>Remand Determination</u> Commerce found that "there have been changes to petroleum wax candles since the time of the LTFV investigation (<u>e.g.</u>, mixing vegetable-oil based waxes with petroleum wax) that represent a gradual evolution in candle production, and these changes have resulted in the later-development of mixed-wax candles."   <u>Remand Determination</u> at 6.   Target argues that Commerce developed an entire new theory on remand unsupported by record evidence.   Target Comments 11-15.   In the court's view Commerce has not "muddied the waters" with new theories. Target Comments 11-15.   Rather, it merely uses the term "gradual evolution" to describe the record evidence that supports its finding that mixed-wax candles do not fall into the category of later-developed merchandise that requires ITC consultation under 19 U.S.C. § 1677j(e)(1)(C).   Commerce's description of the evidence is consistent with Commerce's findings in the <u>Final Determination</u>.   The record evidence supports the finding that there has been industry research and development in the mixing of petroleum wax and vegetable waxes that resulted in the development of mixed-wax candles after the original antidumping investigation.   As Commerce found in the <u>Final Determination</u>: "through a large number of submitted patents, manuals, and

brochures, the record supports that there has been a sustained and significant series of scientific studies since the LTFV investigation centered on the composition of waxes and the application of those waxes to candle-making." Decision Memorandum at 17 (J. App. 11, PR 187).

Target argues that this finding is only supported by a general reference to the Evidence Memorandum and ignores the Lamborn Manual. Target Comments 13-14. These arguments are unpersuasive. The Decision Memorandum provides a detailed analysis of the evidence on record regarding the commercial development of mixed-wax candles after the antidumping investigation. Decision Memorandum at 23-26 (J. App. 11, PR 187). The Evidence Memorandum specifically refers the reader to the Decision Memorandum for an analysis of the evidence. Evidence Memorandum at 1. (J. App. 36, PR 189). Commerce also previously considered the Lamborn Manual in the Final Determination and found that it does not address the mixed-wax candles at issue. Decision Memorandum at 25 (J. App. 11, PR 187).

In sum, Commerce's findings on remand are reasonable given the record evidence.

## B. Diversified Products Analysis

As noted above, in its original brief challenging the Final Results, Qingdao raised the issue of whether Commerce's findings in applying the Diversified Products criteria were reasonable, findings to which the court now turns. In conventional scope determinations Commerce uses the Diversified Products criteria to "determine whether a product is sufficiently similar as merchandise unambiguously within the scope of the

order as to conclude the two are merchandise of the same class or kind." Novosteel SA

v. United States, 25 CIT 2, 15, 128 F. Supp. 2d 720, 732 (2001) (internal citations

omitted).  The same is true in an anticircumvention inquiry.  19 U.S.C. § 1677j(d)(1).

Here, Commerce compared both sets of candles and determined that mixed-wax

candles and petroleum wax candles were similar in all five Diversified Products criteria,

and were therefore the same class or kind of merchandise.   Decision Memorandum

at 26-39.  Plaintiffs challenge Commerce's determination as unsupported by substantial

evidence, arguing that Commerce's findings for four of the Diversified Products criteria

were unreasonable. Plaintiffs argue that mixed-wax candles are different from

petroleum wax candles in general physical characteristics, expectations of the ultimate

purchasers, channels of trade, and methods of advertisement.   As explained below,

Commerce's affirmative class or kind determination is reasonable given the record

evidence.

With regard to "general physical characteristics" of the merchandise, 19 U.S.C.

§ 1677j(d)(1)(A), Commerce found the following:

> [T]he Department notes that the sample candles provided by Petitioners
> were visually similar.  Specifically, the sample mixed-wax candle that
> contains palm wax and the sample petroleum wax candle were both
> pillars, had a similar feel, contained a fragrant scent, and were in the same
> burn stage.  While the colors . . . varied slightly in each pillar and the
> mixed-wax candle contained a label stating "blend," the Department notes
> that without turning the mixed-wax candle over to identify its wax content,
> the sample mixed-wax candle and the sample petroleum wax candle have
> similar physical characteristics making them appear to be
> indistinguishable by appearance, feel, and scent.

Decision Memorandum at 28 (internal citations omitted).

Plaintiffs challenge these findings arguing that mixed-wax candles have a "crystalline, more opaque, exterior appearance" and are superior to petroleum wax candles in retaining their fragrance and shape.  Qingdao Br. 48-50; Target Mot. J. Agency Rec. 36-37 ("Target Br.").  Plaintiffs further claim that mixed-wax candles burn at cooler temperatures, increasing the life of the candle, and burn "cleaner," emitting less airborne pollutants than petroleum wax candles.  Plaintiffs claim that these qualities are the result of differences in the chemical structure of mixed-wax as compared to petroleum wax.  Qingdao Br. 48.

Plaintiffs direct the court to the following evidence to support their claims:

- The declaration of James Groce, R&D Analytical Lab Manager for the Candles Corporation of America (Pub. R. 3105), describing the chemical composition of mixed-wax and petroleum wax candles and the resulting performance of both types of candles.

- A product catalogue distributed by International Group, Inc., a member of the NCA.  (Pub. R. 2638).  Plaintiffs argue that the product catalogue set forth differences in outward appearance and performance of mixed-wax candles.

- Palm oil wax "use guidelines" distributed by the Candlewic Company, an industry supplier of candle wax (Pub. R. 2638).  Plaintiffs contend that these guidelines describe the crystalline appearance of mixed-wax candles.

- The description of the mixed-wax candles from an industry website.

- Industry marketing material that discusses the appearance of mixed-wax candles.

- Statements from "authorities" in the industry that describe differences in emissions.

Qingdao Br. 47-50.

Defendant-Intervenor, the NCA, refers the court to contrary record evidence, arguing that current wax blending technology allows the production of mixed-wax candles that are indistinguishable from petroleum wax candles.  NCA Resp. in Opp'n to Pls.' Mot. J. Agency R. 44 ("NCA Resp. Br.").   Defendant-Intervenor states that petroleum wax candles "can be formulated to produce the same milky, creamy, smooth opaque, or non-smooth appearance as some mixed-wax candles, and the merchandise can be made to "look the same, smell the same, feel the same, can be colored the same, and appear in the same assortment of shapes and physical appearances." NCA Resp. Br. 44.  Defendant-Intervenor submitted physical samples of both types of candles to Commerce to corroborate their assertions.  Decision Memorandum at 27.

With regard to soot emissions, Defendant-Intervenor argues that the amount of soot emitted by a candle is controlled by the type of wick used, not the type of wax. NCA Resp. Br. 44-45.  In support of this claim, Defendant-Intervenor references an independent study, entitled "Candle System Variations," that found that several "paraffin-only blends" (i.e., petroleum wax candles) emitted less soot than paraffin-vegetable wax or all-vegetable wax blended candles.   NCA Resp. Br. 44-45. Defendant-Intervenor also cites "Candle System Variations" for the conclusion that certain "fragrances worked best in 100% paraffinic blend, worst in a 100 percent vegetable wax blend, with the paraffin-vegetable waxes falling into the intermediate category."  NCA Resp. Br. 46.

As evident from the excerpted findings of the Decision Memorandum, Commerce's determination was largely based on its examination of the candle samples

provided by the domestic industry, coupled with an absence of alternative candle samples demonstrating the differences that Plaintiffs alleged.  <u>Decision Memorandum</u> at 28.  Commerce explained:

> Although Respondents continue to claim that differences exist, the Department notes that no Respondent since the Preliminary Determination has submitted physical evidence, such as candles samples, that indicate a difference in physical characteristics.  In contrast, the Department notes that the sample candles provided by Petitioners were visually similar.

<u>Id.</u> (internal citations omitted).

Commerce did not, as Plaintiffs' contend, "reject" their evidence.  Qingdao Br. 45. Rather, Commerce addressed Plaintiffs' arguments regarding the differences in the physical characteristics of the merchandise and drew reasonable inferences from the record as a whole.  Specifically, Commerce concluded the following regarding the chemical structure of mixed-wax and its impact on the candles' physical characteristics:

> Although one of the Respondents, . . . , has placed evidence on the record from manufacturers, . . . , regarding the chemical composition of mixed-wax candles and its impact on the candle's physical characteristics, this does not conclusively establish there are physical differences.  Instead of submitting actual physical evidence that documents these differences, [Respondents] submitted advertisements . . . that stated candles made from vegetable-based wax are typically harder than petroleum wax candles.  While the Department continues to acknowledge . . . that one of the components, palm and vegetable-based oils, of mixed-wax candles possess different chemical structures, this does not necessarily lead to a conclusion that these candles have distinct physical characteristics.  As in the Preliminary Determination, the Department continues to find that, without conclusive physical evidence demonstrating the "alleged" physical differences, the sample candles support a conclusion that these mixed-wax candles are not distinguishable from in-scope petroleum wax candles.

<u>Decision Memorandum</u> at 28-29 (internal citations omitted).  On the issue of burn performance and soot emissions, Commerce credited the Candle System Variations

study that found "using a vegetable wax in a candle blend will not automatically ensure

no or low sooting." Id. at 29.

Plaintiffs' arguments invite the court to reweigh the evidence and replace

Commerce's findings anew, something the court simply cannot do. Hoogovens Staal

BV v. United States, 24 CIT 242, 247, 93 F. Supp. 2d 1303, 1307-1308 (2000)

("In reviewing agency determinations, the court declines to reweigh or reinterpret the

evidence of record. . . . It is not the province of this court to review the record evidence

to determine whether a different conclusion could be reached, but to determine whether

Commerce's determination is supported by substantial evidence.").    Commerce's

determination that there is "no substantial difference" between the general physical

characteristics of mixed-wax candles and petroleum wax candles is reasonable, and

thus supported by substantial evidence.

Commerce's analysis of the remaining Diversified Products criteria is likewise

reasonable.  On the issue of the "expectations of the ultimate purchasers," 19 U.S.C.

§ 1677j(d)(1)(B), Plaintiffs argue that mixed-wax candles are desired over petroleum

wax candles for their asserted superiority in appearance, fragrance, emissions, and

burn performance.  Qingdao Br. 51-52; Target Br. 37.  Specifically, Plaintiffs argue that

mixed-wax candles are desired for their "'natural' and clean composition," Qingdao

Br. 51, and because they are perceived as being more environmentally sound

(i.e.,"cleaner burning").   Target Br. 37.  Plaintiffs reference marketing material from

retailers and manufacturers of mixed-wax candles as well as news articles that "tout"

these differences.  Qingdao Br. 51.

Commerce, however, was persuaded by contrary evidence:

 While the submitted news articles discuss the growth of the market of natural candles and that the use of petroleum wax candles give off carcinogenic toxins, the Department does not doubt that subset of mixed-wax candle purchasers maybe driven by such concerns.  However, the Department finds that these news articles do not conclusively establish that the consumer demand as a whole, even in large, for mixed-wax candles can be attributed to health concerns.  In fact, the Department notes that there is other evidence on the record that shows that the alleged health benefits of a candle is not one of the factors that primarily influence a consumer's purchase.  Specifically, the 2005 Unity Market Report found that, . . . only 7 percent of consumers reported they based their purchase on a candle's health properties, . . . .

Decision Memorandum at 31-32 (internal citations omitted).  Commerce determined that the two attributes of a candle that drive the purchasing decision of a consumer are "fragrance and decorative touches," and not wax composition.  Id. at 32.  Commerce is entitled to accord that weight it feels is due the evidence.  See, e.g., Novosteel SA, 25 CIT at 20, 128 F. Supp. 2d at 736 (in the context of a conventional scope determination).

Plaintiffs argue that Commerce "fail[ed] to recognize" that fragrance and decoration "are the very characteristics that distinguish a majority of mixed-wax vegetable candles from petroleum wax candles."  Qingdao Br. 52.  This argument, however, assumes that consumers can distinguish between the merchandise.  Commerce disposed of this argument in its comparison of the physical characteristics of the merchandise concluding that mixed-wax candles are indistinguishable from petroleum wax candles.  Here, it addressed the argument again in the context of consumer expectation:

> [I]n the 2005 Unity Marketing Report, only thirteen percent of candle purchasers indicated that they based their purchase on the quality of the candle.  The report concluded that this could lead one to infer that the ultimate purchaser of a candle "does not know how to distinguish" between types of candles, particularly when there is no distinction of the wax content.  Moreover, [Respondents], themselves, acknowledged that consumers base their purchase of a candle upon the following criteria: appearance, form, burn quality, and aroma, which corresponds with some of the top purchasing factors, such as favorite scent, style and design, and long lasting burn, listed in the 2005 Unity Marketing Report.  The Department finds that, while two of the Respondents made statements and submitted some evidence, including news articles and other studies, the Department observes that this information, unlike the 2005 Unity Marketing Market Report submitted by Petitioners, does not directly measure the actual buying power sentiments and expectations of the ultimate purchaser.

Decision Memorandum at 32-33 (internal citations omitted).

With regard to the "channels of trade" in which the merchandise is sold, 19 U.S.C. § 1677j(d)(1)(D), Plaintiffs argue that "natural [wax] based candles" (i.e., mixed-wax candles) are sold by "bath, body and beauty 'concept' stores"[4] as well as resort and day spas.  Qingdao Br. 53-54.  Plaintiffs contend that these markets focus on mixed-wax candles for their "environmental, aromatic and burn qualities."  Qingdao Br. 54.

Commerce, however, found otherwise—largely due to a lack of corroborative evidence from Plaintiffs:

> Since the Preliminary Determination, only one Respondent, . . . , submitted information regarding whether mixed-wax candles were sold in different channels of trade than petroleum wax candles.  While [Respondents] alleged in their factual information submission that some retailers only sell candles made of natural wax, the Department notes that [Respondents] did not provide any supporting documentation or an

---

[4] Specifically, Plaintiffs identify Bath & Body Works, White Barn Candle, Victoria Secret Beauty, The Body Shop, L'Occitane, Sephora, Ulta, PureBeauty, MAC, and Douglas.

> indication as to how large a share of the trade this observation covered. Additionally, [Respondents] also alleged that retailers market the environmental and health benefits of mixed-wax candles.  However, the Department notes that, while [Respondents] submitted some advertisements marketing the benefits from mixed-wax candles, this does not establish that mixed-wax candles are sold in different channels of trade, or to the extent to which this phenomenon exists throughout the trade as well.

Decision Memorandum at 36.  Commerce was persuaded by photographs submitted by

the domestic industry that depicted the merchandise being sold side-by-side.

> Unlike Respondents, who either did not provide further information or the submitted information that was not supported by corroborative evidence, the Department finds that Petitioners have submitted information on the record demonstrating that mixed-wax candles are sold in the same channels of trade as petroleum wax candles.  Specifically, the Department notes that Petitioners submitted photographs of displays from various retailers, including Target; Walmart; Kohls' [sic]; and Bed Bath and Beyond; which shows that candles are sold side-by-side without indication of health benefits and wax content.  The Department notes that these photographs of displays from various retailers, . . . , are corroborated by the Spa and Industry Salon Report, which states that both mixed-wax candles and petroleum wax candles are sold within the spa and salon industry.

Id.

Finally, with regard to the manner in which the merchandise is "advertised and

displayed," 19 U.S.C. § 1677j(d)(1)(E), Plaintiffs argue that advertisements and displays

emphasize the physical characteristics that differentiate mixed-wax candles from

petroleum wax candles.  Qingdao Br. 53-54; Target Br. 37.  Specifically, Plaintiffs argue

that advertisers highlight the "environmental, aromatic and burn qualities" of mixed-wax

candles.  Qingdao Br. 54.  As examples, Plaintiffs cite an advertisement for soy candles

that state "Benefits of Soy," "Clean & Long Burning," and "Environmentally Safe," as

well as packaging from another candle that states "Wax from Coconut Palm.

Renewable Resource.  Cleaner Burning.  Beautifully Fragranced."  Qingdao Br. 54.

Plaintiffs contend that mixed-wax candles are generally advertised as "higher quality

candles" as they are "capable of more subtle and pleasant scents, impart an attractive

opaque or crystalline look . . . , and hold their shape better than petroleum wax."

Qingdao Br. 54; Target Br. 37.

> Again, Commerce was persuaded by contrary evidence:
>
> One of the Respondents . . .  continues to argue that mixed-wax candles are advertised and displayed as environmentally friendly and natural, which petroleum wax candles never are.  As support for its argument, [Respondent] submitted website advertisements.  However, the Department notes there is record evidence that shows that petroleum wax candles also are advertised and displayed as being environmentally friendly.
>
> * * *
>
> Additionally, the Department finds that the majority of the evidence on the record does not establish that mixed-wax candles as a rule are displayed differently than petroleum wax candles.  As noted by [Respondents] and the 2005 Unity Market Report, consumers typically base their purchase upon . . . scent, color, cost, and shape.  While [Respondents] argue that consumers may not usually not [sic] be aware of the wax content of the candles they purchase, they can identify mixed-wax candles because these candles are physically distinct from petroleum wax candles.  However, as discussed above, the Department finds this argument unpersuasive with respect to display because mixed-wax candles are virtually indistinguishable from petroleum wax candles. . . . Of note is that the submitted pictures of Kohls [sic], Bed Bath & Beyond, and Walmart shows that both in-scope petroleum wax candles and mixed-wax candles, . . . , are displayed without any differentiation between these types of candles.

Decision Memorandum at 38-39 (internal citations omitted).

In sum, Commerce's analysis with respect to the remaining Diversified Products

criteria is reasonable.  Accordingly, Commerce's analysis with respect to the

expectations of the ultimate purchasers, channels of trade, and manner in which the merchandise is advertised and displayed is supported by substantial evidence.

### C.  Suspension of Liquidation

The liquidation of merchandise subject to an affirmative anticircumvention determination is suspended as of the date of initiation of the anticircumvention proceeding.  19 C.F.R. § 351.225(l) (2004).  After finding that mixed-wax candles were circumventing the underlying dumping order, Commerce instructed U.S. Customs and Border Protection to suspend liquidation of all entries of the subject merchandise that were entered, or withdrawn from warehouse, for consumption on or after February 25, 2005, the date of the initiation of the anticircumvention inquiry, and to collect cash deposits on all such unliquidated entries.  Final Determination, 71 Fed. Reg. at 59,078.

Plaintiffs contend that Commerce's application of 19 C.F.R. § 351.225(l) has an impermissible retroactive effect on entries of mixed-wax candles subject to the Final Determination.  Plaintiffs argue that the multiple scope determinations excluding mixed-wax candles from the petroleum wax candle order created a settled expectation on their part that mixed-wax candles were outside the scope of the order.  Although this may have been true prior to the initiation of the anticircumvention inquiry (and may have informed Plaintiffs' expectations about its eventual result), Plaintiffs were nevertheless always aware of the legal consequences of an affirmative circumvention determination (and the operation of 19 C.F.R. § 351.225(l)): Entries of mixed-wax candles found to be circumventing the Order would be suspended as of the date of initiation.

19 C.F.R. § 351.225(l) was promulgated and published in the <u>Federal Register</u> in 1997, and Plaintiffs are charged with knowledge of the regulation as of that date. <u>See</u> 44 U.S.C. § 1507; <u>Fed. Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.") (citations omitted).  The regulation did not change during the course of the anticircumvention inquiry.  Commerce simply applied the regulation to the entries that were the subject of the proceeding, consistent with the regulation's requirements.  There is, therefore, no impermissible retroactive application of the law operating in this case.

## IV. Conclusion

The court denies Plaintiffs' motions for judgment on the agency record and will enter judgment in favor of Defendant.

                                                      _____/s/ Leo M. Gordon_____
                                                      Judge Leo M. Gordon


Dated:  New York, New York
           June 17, 2009

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TARGET CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 06-00383 |

## JUDGMENT

This case has been submitted for decision, and the court, after due deliberation, having rendered opinions; now in conformity with those decisions, it is hereby

**ORDERED** that Plaintiffs' motions for judgment on the agency record are denied; and it is further

**ORDERED** that judgment is entered for Defendant.


                                                            /s/ Leo M. Gordon
                                                        Judge Leo M. Gordon



Dated:    June 17, 2009
          New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                          Deputy Clerk